**WO**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Milo McCormick Stanley,               )
                                      )     CV-98-0430-PHX-MHM
            Petitioner,               )
                                      )
    v.                                )     **MEMORANDUM OF DECISION**
                                      )     **AND ORDER**
Dora Schriro, et al.,[1]              )
                                      )
            Respondents.              )
                                      )

     Milo McCormick Stanley ("Petitioner") filed a Petition for Writ of Habeas Corpus alleging that he is imprisoned and sentenced to death in violation of the United States Constitution. Petitioner's Second Amended Petition raised nine claims. (Dkt. 33).[2] In an Order dated July 31, 2000, the Court found that Claims 2 (in part), 4, and 7 were procedurally barred. (Dkt. 43.) The Court further found that Claims 1, 2 (in part), 3, 5, 6, 8, and 9 were properly exhausted and subject to review on the merits. (Id.) In this Order the Court reviews these claims.[3] For the reasons set forth herein, the Court concludes that Petitioner is not entitled to habeas relief.

----

[1]    Dora Schriro, Director of the Arizona Department of Corrections, is substituted pursuant to Fed. R. Civ. P. 25(d)(1).

[2]    "Dkt" refers to the documents in this Court's file. "M.E." refers to the minute entries of the state court. "R.T." refers to the reporter's transcript. "ROA-PCR" refers to the four-volume record from the post-conviction proceedings (Case No. CR-97-0422-PC).

[3]    Petitioner concedes that Claim 8 "does not entitle him to relief" and that Claim 9 is moot. (Dkt. 52 at 51-52.) The Court does not address these claims.

# BACKGROUND

Following a jury trial, Petitioner was convicted of two counts of first degree murder for the deaths of his wife and five-year-old daughter. The Arizona Supreme Court described the relevant facts as follows:

> At approximately 11:30 p.m. on June 19, 1986, Stanley reported to the Clarkdale Police that his wife and five-year-old daughter had gone for a walk at about 10:45 p.m. and had not returned. Police officers and family members began searching the community for the woman and child.

> At about 9:30 the next morning, two of Stanley's wife's sisters went to the business owned by Stanley and his father, a Volkswagen garage. There they saw the car the missing woman had driven the previous evening. Stanley's father gave the women permission to look through the car and they found one of Stanley's wife's shoes and one of the missing child's shoes. They also noted an offensive odor in the automobile. They reported these findings to the Clarkdale Police Department, telling the officers their sister and niece had worn the shoes the night before.

> One of the sisters returned to the garage that afternoon. Finding it locked, she went to Stanley's apartment and asked his mother for the keys. Stanley gave his mother the keys and she gave them to the sister, who then returned to the garage. Looking through the car again, she discovered what she believed to be bloodstains. Later, the second sister arrived at the shop and she too saw the bloodstains. They also reported this to the Clarkdale Police.

> Upon receiving this new information, five officers accompanied the sisters to the garage and entered the premises. They found a shell casing to a small calibre firearm and some bloody socks in the car.

> At about 5:30 p.m. the same day, officers went to Stanley's apartment and requested that he and his father accompany them to the garage. They obtained written consent from both Stanley and his father to search the garage. While officers continued to search the premises pursuant to the consent given, Stanley agreed to accompany an investigator (Saravo) to the county building for further interviewing regarding his missing wife and child. After advising Stanley of his Miranda rights, Saravo asked him for permission to search his apartment. Stanley signed a consent form. During questioning, Stanley stated that he did not wish to say anything more until he could speak with a lawyer. He was extremely emotional at this time.

> Meanwhile, pursuant to the signed consent forms, officers searched the garage and discovered a blood-soaked blanket and seat cover in a trash can located inside the business premises. They then returned to the county building to secure a search warrant. While there, they told Saravo what they had found. Saravo communicated to Stanley that foul play was suspected and disclosed the items that had been found at the garage.

> Stanley again became extremely emotional and began to cry. After a short while, Saravo asked whether Stanley was all right. Stanley then

- 2 -

confessed that he had shot his wife and daughter. The officers questioned him in an attempt to determine whether the victims might still be alive. Stanley responded that they were dead, and the officers asked where the bodies could be found. Stanley then recounted the events of the previous evening and the area where he had hidden the bodies.

During this time, a search warrant had been drafted and the officers sought a magistrate to issue the document. The magistrate was not at home, but his wife was able to contact him and advised him that he was needed at the county building. When he arrived there, he learned that everyone was at the garage. The magistrate then proceeded to the garage, entered, and sat at a desk just inside the door where he reviewed the affidavit and issued the warrant.

Police found the bodies of Stanley's wife and daughter alongside Allen Springs Road at the location indicated by Stanley. Stanley's wife had been shot three times, the child had been shot once.

State v. Stanley, 167 Ariz. 519, 521-22, 809 P.2d 944, 946-47 (1991).

The trial judge sentenced Petitioner to life imprisonment for the murder of his wife and imposed the death penalty for the murder of his daughter. Id. The court found three aggravating circumstances: that Petitioner was convicted of another homicide committed during the commission of this offense, A.R.S. § 13-703(F)(8); that he was an adult and his daughter was under fifteen years of age, § 13-703(F)(9); and that he committed the offense in an especially depraved manner, § 13-703(F)(6). The court found five mitigating circumstances, but determined they were insufficient to require leniency. The court refused to find that Petitioner's chronic substance abuse and his drug and alcohol use at and around the time of the crimes were mitigating factors.

Petitioner appealed to the Arizona Supreme Court, which affirmed the convictions and sentences. Id. at 532, 809 P.2d at 957. Petitioner unsuccessfully sought certiorari review in the United States Supreme Court. Stanley v. Arizona, 502 U.S. 1014 (1991).

On March 19, 1993, Petitioner filed a petition for post-conviction relief ("PCR") in the trial court pursuant to Rule 32 of the Arizona Rules of Criminal Procedure. After the PCR court dismissed the petition, Petitioner filed a petition for review in the Arizona Supreme Court, which was summarily denied on February 20, 1998.

On March 9, 1998, Petitioner filed a Petition for Writ of Habeas Corpus in this Court.

- 3 -

(Dkt. 1).  He filed his Second Amended Petition on March 30, 1999.  (Dkt. 33).  Following this Court's Order regarding the procedural status of Petitioner's claims, Petitioner filed a Memorandum on the Merits.  (Dkt. 52.)  Respondents filed a Response (dkt. 56) to which Petitioner filed a Reply (dkt. 64).

### LEGAL STANDARD FOR FEDERAL HABEAS RELIEF

Because Petitioner filed his initial Petition for Writ of Habeas Corpus after April 24, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA") govern to his claims.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997).

For properly preserved claims "adjudicated on the merits" by a state court, the AEDPA enacted a more rigorous standard for habeas relief.  See Miller-El v. Cockrell, 537 U.S. 322, 337 (2003); Lambert v. Blodgett, 393 F.3d 943, 965 (9th Cir. 2004) ("Inspired by principles of comity, finality and federalism, AEDPA establishes a highly deferential standard for reviewing state court determinations").  Under the AEDPA Petitioner is not entitled to relief on any claim adjudicated on the merits in state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In addition, section 2254(e)(1) provides:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).[4]

---

[4]    This Court applies these deferential standards of review to the "last reasoned decision" of the state court, Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991), which, in this case, includes the decision of the Arizona Supreme Court on direct appeal, 167 Ariz. 519, 809 P.2d 944, or the ruling of the PCR court (M.E. 5/19/97).

To assess a habeas claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law includes the holdings of the Supreme Court at the time the petitioner's state court conviction became final. See Williams v. Taylor, 529 U.S. 362, 365 (2000). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. See id. at 381. A state court decision is "contrary to" clearly established federal law if it failed to apply the correct controlling Supreme Court authority, or if it applied the correct authority to a case involving facts materially indistinguishable from those in a controlling Supreme Court case, but nonetheless reached a different result. Id. at 413; see also Lockyer v. Andrade, 538 U.S. 63, 72 (2003); Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004).

A state court decision amounts to an "unreasonable application" under § 2254(d)(1) if the state court correctly identified the governing "clearly established" legal principle from the Supreme Court's decisions, but then made an objectively unreasonable application of that principle to the facts of the petitioner's case. See Andrade, 538 U.S. at 75. An "objectively unreasonable" application of federal law involves more than an incorrect or even clearly erroneous application of federal law. See Williams, 529 U.S. at 410-11 ("[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.")

The AEDPA mandates deferential review of a state court's application of clearly established Supreme Court precedent. See Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (citing Lindh v. Murphy, 521 U.S. 320, 333 n.7 (1997)). In considering a challenge under either the "contrary to" or "unreasonable application" prong of subsection (d)(1), state court factual determinations are presumed correct pursuant to § 2254(e)(1) and can be rebutted only by clear and convincing evidence. See Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir.

2004), <u>cert. denied</u> 543 U.S. 1038 (2004).

To obtain habeas relief under subsection (d)(2), the state court factual determination at issue must be "objectively unreasonable" in light of the evidence presented in the state court proceeding. <u>Miller-El</u>, 537 U.S. at 340; <u>Davis v. Woodford</u>, 384 F.3d 628, 637-38 (9th Cir. 2004). As the Ninth Circuit has explained, the "unreasonable determination" clause,

> applies most readily to situations where petitioner challenges the state court's findings based entirely on the state record. Such a challenge may be based on the claim that the finding is unsupported by sufficient evidence, that the process employed by the state court is defective, or that no finding was made by the state court at all.

<u>Taylor</u>, 366 F.3d at 999 (citations omitted).

When a petitioner challenges a state court's factual findings under subsection (d)(2), a federal court must be satisfied that an appellate court could not reasonably affirm the finding. <u>Taylor</u>, 366 F.3d at 1000. "Once the state court's fact-finding process survives this intrinsic review . . . the state court's findings are dressed in a presumption of correctness, which then helps steel them against any challenge based on extrinsic evidence, <u>i.e.</u>, evidence presented for the first time in federal court." <u>Id.</u> The presumption of correctness may be overcome only by clear and convincing evidence, pursuant to § 2254(e)(1). <u>Id.</u>; <u>see</u> <u>Nunes v. Mueller</u>, 350 F.3d 1045, 1055-56 (9th Cir. 2003).

## DISCUSSION

**Claim 1:** **The continued interrogation of Petitioner after he had invoked his right to remain silent and his right to counsel, and the trial court's admission of his statements, violated Petitioner's rights under the Fifth, Sixth, and Fourteenth Amendments.**

Petitioner alleges that his rights were violated when Investigator Saravo interrogated him after he had invoked his <u>Miranda</u> rights, and by the trial court's ruling that his statements were admissible at trial. (Dkt. 52 at 8-9.) On direct review, the Arizona Supreme Court found that Petitioner's statements were voluntary and not obtained in violation of his right to counsel. <u>Stanley</u>, 167 Ariz. at 523-25, 809 P.2d at 948-50. The court concluded

> (1) that Stanley was not in custody; (2) his sixth amendment rights did not attach; (3) even though a suspect invokes his right to decline further

interrogation until he has spoken to a lawyer, the police may continue to question him in a non-custodial setting; and, (4) so long as the responses are voluntary, and his will has not been overborne, the suspect's responses may be used in evidence against him.

Id. at 525, P.2d at 950.  The key issue discussed by the state court, and raised here by Petitioner, is whether Petitioner was "in custody" when he made his statements.

Relevant Facts:

The trial court held an evidentiary hearing on Petitioner's motion to suppress his statements; Investigator Saravo and other officers who were involved in the investigation testified.[5]  (See R.T. 5/14/87-5/15/87.)  The evidence produced at the hearing revealed the following.

On the evening of June 20, 1986, Petitioner and his father arrived at their auto repair shop after being contacted by police officers who had located what appeared to be blood stains in Petitioner's car.  (See, e.g., R.T. 5/15/87 at 392.)  After being provided Miranda warnings, both Petitioner and his father voluntarily consented to a search of the shop.  (Id. at 441.)  Saravo then asked Petitioner if he would accompany him to his office at the county building, located a few blocks down the street, to discuss the case; Petitioner agreed.  (Id. at 446.)  Saravo testified that he wanted to speak with Petitioner at his office because at the shop "there were a lot of people around and there was really nowhere for us to talk."  (Id. at 446-47.)  He also explained to Petitioner that the reason for conducting the interview at his office was that the shop was too crowded.  (Id. at 497.)  At that point, according to Saravo, Petitioner was not under arrest and was not a suspect.  (Id. at 446.)  Petitioner and Saravo rode to the county building in another officer's vehicle.  (Id.)

At the office, Petitioner agreed to let Saravo tape-record their conversation.  (Id. at

---

[5]       Garry Saravo was an investigator with the Yavapai County Attorney's Office. The Clarkdale Police Department requested his assistance, as well as that of the Arizona Department of Public Safety ("DPS"), when Petitioner reported that his wife and child were missing.  (See, e.g., R.T. 5/15/87 at 253).  Initially, Saravo and other DPS officers aided in the search efforts as members of the county dive team.  (See id. at 437).

447-48.)   Saravo did not re-advise Petitioner of his <u>Miranda</u> rights prior to the interview. (<u>Id.</u> at 448.)   Saravo did not tell Petitioner that he was under arrest or that he was not free to leave.  (<u>Id.</u>)  Saravo testified that he did not have probable cause to arrest Petitioner at that point, and that if Petitioner had gotten up and left there was nothing he could have done to detain him.  (<u>Id.</u>)  DPS Officer Wes Stanford was also present in the office at the outset of the interview, which began at 7:00 p.m. (Dkt. 57, Ex. B.)

During the first portion of the interview, Saravo posed a series of questions about the events leading up to the disappearance of Petitioner's wife and daughter.  (<u>Id.</u>)  He then asked Petitioner about the blood in his car, and also requested consent to search Petitioner's residence.  (<u>Id.</u> at 18, 21).  At this point, he again advised Petitioner of his <u>Miranda</u> rights, but also told Petitioner that he was "not under arrest at this time."  (<u>Id.</u>)  At the conclusion of his recitation of the <u>Miranda</u> advisory, Saravo reiterated to Petitioner:  "You can choose at any time to stop answering questions or stop making statements.  Okay?"  (<u>Id.</u> at 22.) Petitioner then signed a consent form authorizing the search of his home, after which he left the office to get a drink.  (<u>Id.</u> at 25.)  It was 7:42 p.m.  (<u>Id.</u>)

When the interview resumed, Saravo and Petitioner discussed a scenario in which Petitioner's wife and daughter had gone to his shop and been murdered there by an unknown assailant.  (<u>Id.</u> at 26-30.)  Saravo began to express skepticism about this theory:

> Q:   Do you really think somebody actually surprised your wife at that shop, took your gun and put her in that car and took her out and killed her and brought the car back?   Do you think that could have possibly happened?
> A:   Yeah.
> Q:   You think that could have happened?  I don't think that could have happened.
> A:   No?
> Q:   I think if that happened, if that is in fact what happened, that person almost had to have been you.  Don't you think?
> A:   Yeah.
> Q:   Unless you know somebody else it could have . . . some other way it could have happened . . . been somebody else, right?
> A:   Right.
> Q:   So if that in fact happened, if that gun was taken and your wife and child, your girl were put in that car and they, for some reason, were shot, okay, and there's blood on the inside of that car and the outside of

that car, then who would that person had to have been?
A:    Me.
Q:    Did something happen with you and your wife?
A:    I think I better talk with a lawyer.  I don't want to say anymore.
Q:    You don't want to talk to me any further.
A:    No.
Q:    Okay.  We will conclude this interview at 7:56.

(Id. at 30-31.)

After terminating the interview and turning off the tape, Saravo left the office and speak with DPS Officer Wayne Wright, who told Saravo that officers searching Petitioner's shop had located additional evidence, including a blood-soaked blanket and seat cover found in a trash can.  (R.T. 5/15/87 at 452; see id. at 79, 314.)  Saravo then returned to his office, turned on the tape recorder, and spoke again to Petitioner:

Q:    You have requested to talk to an attorney, you don't have to talk to me.
      I am going to inform you at this time, though, that they have found
      bloody stuff down at the shop, okay.  They have evidence down there
      in the trash cans and stuff like that.  Have you hurt yourself or anybody
      hurt themself [sic] at the shop?
A:    [No transcribed answer.]
Q:    Okay.  It appears now that very strongly that your wife has met some
      foul play, understand?
A:    Yes, sir.
Q:    There's nothing more that you would like to do to locate your wife and
      child?  There were bloody seat covers and other things.
(Long pause – Milo crying.)
Q:    What do you think, Milo?
(Pause – Milo still crying.)
Q:    I'll be right back.
A:    Okay.  (Still sobbing.)

(Dkt. 57, Ex. B at 31-32.)

Saravo again left the office, then returned and asked a series of questions concerning Petitioner's full name, date of birth, social security number, and arrest record.  (Id. at 32-33.) At that point, either the tape ran out or Saravo turned the tape-recorder off.  (R.T. 5/15/87 at 453.)  Considering the interview complete, Saravo removed the tape and placed it in his briefcase.  (Id. at 462.)  According to Saravo, Petitioner remained seated; he was "visibly shaking" and "crying rather hard."  (Id.)  Saravo asked Petitioner if he was all right; Petitioner responded, "No."  (Id.)  Saravo asked Petitioner what he could do to help.  (Id.)

1   Petitioner replied, "Shoot me." (Id.) Saravo asked, "Why would I want to shoot you?" (Id.)

2   Petitioner answered, "Because I shot them. Ah, I was drunk out of my gourd. Damn alcohol.

3   We were up on Mingus." (Id. at 463.) This exchange took place approximately five to ten

4   minutes after the recording had ended and ten to fifteen minutes after Petitioner had invoked

5   his right to remain silent. (Id. at 516.)

6        Saravo then questioned Petitioner about the location of the shooting and asked

7   whether the victims could still be alive. (Id.) He also reminded Petitioner of his right to

8   remain silent and his right to an attorney. (Id.) According to Saravo, Petitioner, though still

9   crying, was talkative, coherent, and appeared relieved. (Id. at 467-68.) The portion of the

10  interview that occurred after Petitioner admitted to the shooting lasted fifteen to twenty

11  minutes. (Id. at 468.) At its conclusion, Petitioner was arrested and transported to the police

12  station. (Id.)

13       In denying Petitioner's motion to suppress his statements, the trial court ruled that

14  neither Miranda v. Arizona, 384 U.S. 436 (1966), nor Edwards v. Arizona, 451 U.S. 477

15  (1981), was violated because "at the time Defendant made the confession, the Court finds as

16  a fact he was not in custody and was free to leave." (M.E. 7/11/87.) The Arizona Supreme

17  Court affirmed this finding:

18       In the present case, law enforcement was activated by a call from
         Stanley into a search for his wife and daughter when he reported them missing.
19       During the search and investigation, Saravo testified that Stanley was asked if
         he would accompany Saravo to the county building to "talk to him about, you
20       know, things we had found." Stanley voluntarily agreed to accompany him. He
         was not handcuffed; indeed, he was told he was not under arrest and was not
21       a suspect. Stanley was wearing a hunting knife and was not disarmed.
         Although the Cottonwood Police Station was not very far from the garage,
22       Stanley was questioned at Saravo's office in the county building, which also
         was not far from the garage.
23
         At the time of questioning, the investigation's focus was on a search for
24       missing persons initiated by Stanley himself, not on a homicide. While Saravo
         had suspicions about Stanley, there was no direct evidence of his involvement.
25       Testimony during the hearing on the motion to suppress was unequivocal that
         Stanley was free to leave. During the interview, he left the office unescorted
26       to get something to drink and use the restroom. He remained in the office once
         Saravo stated that the interview was terminated and while Saravo was putting
27       away the tape recorder. There was neither a display of weapons nor physical

28

contact or use of language indicating that Stanley's presence or statements were compelled. <u>United States v. Mendenhall</u>, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497, <u>reh'g denied</u>, 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1138 (1980).

<u>Stanley</u>, 167 Ariz. at 523, 809 P.2d at 948.

    <u>Clearly Established Law:</u>

    For the purposes of this claim, clearly established federal law includes <u>Miranda</u>, 384 U.S. 436, and <u>Edwards</u>, 451 U.S. 477.  In <u>Miranda</u>, the Supreme Court held that prior to custodial interrogation a suspect must be informed of his right to remain silent and his right to have an attorney present.  <u>Id.</u> at 479.  If the suspect invokes either of these rights, interrogation must cease.  <u>Id.</u> at 474.  In <u>Edwards</u>, the Court explained that once an accused has expressed a desire to deal with police only through counsel, he is not to be subjected to further interrogation until counsel has been made available to him unless he himself initiates further communications.  451 U.S. at 484-85.  The protections afforded by <u>Miranda</u> and <u>Edwards</u> only apply, however, when a suspect is "in custody." <u>Id.</u> at 484.

    With respect to the question of what constitutes "custody," applicable federal law is contained in a line of cases that includes <u>Stansbury v. California</u>, 511 U.S. 318 (1994) (per curiam); <u>Berkemer v. McCarty</u>, 468 U.S. 420 (1984); <u>California v. Beheler</u>, 463 U.S. 1121 (1983) (per curiam); <u>Oregon v. Mathiason</u>, 429 U.S. 492 (1977) (per curiam); and <u>Beckwith v. United States</u>, 425 U.S. 341 (1976).  These cases explain that a suspect is in custody when there has been a "'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  <u>Beheler</u>, 463 U.S. at 1125 (quoting <u>Mathiason</u>, 429 U.S. at 495).  This inquiry requires a court to examine the totality of the circumstances from the perspective of a reasonable person in the suspect's position.  <u>McCarty</u>, 468 U.S. at 442.

    The Supreme Court has emphasized that this test is objective, explaining in <u>Stansbury</u>: "It is well settled, then, that a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question of whether the individual is in custody for purposes of <u>Miranda</u>."  511 U.S. at 324; <u>see Beheler</u>, 463 U.S.

1  at 1124 n.2 (rejecting the notion that the "in-custody" requirement is satisfied by the mere

2  fact that the person being interviewed is the "'focus' of a criminal investigation"); Minnesota

3  v. Murphy, 465 U.S. 420, 431 (1984) ("The mere fact that an investigation has focused on

4  a suspect does not trigger the need for Miranda warnings in noncustodial settings");

5  Beckwith, 425 U.S. at 347.  The Stansbury Court further explained that, "Even a clear

6  statement from an officer that the person under investigation is a prime suspect is not, in

7  itself, dispositive of the custody issue, for some suspects are free to come and go until the

8  police make an arrest." 511 U.S. at 325.

9      In Thompson v. Keohane, 516 U.S. 99 (1995), the Supreme Court clarified the

10  standard of habeas review of a state court's determination regarding whether a suspect was

11  "in custody" for Fifth Amendment purposes.  The Court held that a state court's decision

12  with respect to the "in-custody question" is not a factual determination presumed to be

13  correct under the former version of § 2254(d) (recodified now as § 2254(e)(1)).  Id. at 102.

14  Rather, it is a "'mixed question of law and fact' qualifying for independent review."  Id.  The

15  Court further explained that a determination of whether there was "a formal arrest or restraint

16  on freedom of movement of the degree associated with a formal arrest," Beheler, 463 U.S.

17  at 1125, consists of "two discrete inquiries."  Thompson, 516 U.S. at 112.  The first inquiry

18  – regarding the circumstances surrounding the interrogation – is factual and therefore the

19  state court's findings are entitled to a presumption of correctness.  Id.  Under Thompson,

20  therefore, the "scene- and action-setting" facts of Petitioner's interview, as set forth above,

21  "attract a presumption of correctness."  Id.

22      The second inquiry – whether a reasonable person would have felt he was not at

23  liberty to terminate the interrogation and leave – calls for application of controlling legal

24  standards to the historical facts and thus constitutes a mixed question of law and fact.  Id. at

25  112-13.  Consequently, this Court independently determines whether the state court's

26  conclusion that Petitioner was not in custody was contrary to, or involved an unreasonable

27  application of, clearly established law under § 2254(d)(1).  See Yarborough v. Alvarado, 541

28

1    U.S. 652, 663 (2004).

2        Analysis:

3        Petitioner first argues that the Arizona Supreme Court's decision was contrary to

4    established federal law because the court failed to apply the correct legal standard when

5    analyzing whether Petitioner was "in custody" for Miranda purposes. Specifically, Petitioner

6    contends that the state court failed to consider the factors that distinguished his case from the

7    Supreme Court's ruling in United States v. Mendenhall, 446 U.S. at 544. (Dkt. 52 at 14-15.)

8    This Court disagrees.

9        At the conclusion of its analysis of the "in custody" issue, the Arizona Supreme Court

10   cited Mendenhall.  Stanley, 167 Ariz. at 523, 809 P.2d at 958.  In Mendenhall, the Court

11   found that the defendant was not seized under the Fourth Amendment when DEA officers

12   approached her in an airport, received suspicious answers to their questions, and asked her

13   to accompany them to their office, where she consented to a search.  446 U.S. at 545.

14   Petitioner notes that, unlike the defendant in Mendenhall, he invoked his rights under

15   Miranda before making his confession. He argues therefore that, "Insofar as the Arizona

16   Supreme Court chose to overlook the factors that distinguish his case from Mendenhall, it

17   applied an incorrect legal standard." (Dkt. 52 at 14-15.) As Respondents note, however, it

18   is clear from the context of the Arizona Supreme Court's citation of the case that the

19   reference to Mendenhall was intended simply to illustrate that specific factors – the "display

20   of a weapon," "physical contact" or "physical touching," and "use of language" – are

21   appropriate to consider when determining whether a "reasonable person would have believed

22   that he was not free to leave." Mendenhall, 446 US at 554; see Stanley, 167 Ariz. at 523, 809

23   P.2d at 948.

24       Along with its citation of Mendenhall, the Arizona Supreme Court annunciated the

25   correct, objective, test for determining whether interrogation is "custodial." Stanley, 167

26   Ariz. at 523, 809 P.2d at 948.  The court also cited its prior rulings in cases such as State v.

27   Carillo, 156 Ariz. 125, 750 P.2d 883 (1988), and State v. Carter, 145 Ariz. 101, 700 P.2d 488

28

1   (1985), decisions which in turn relied upon appropriate United State Supreme Court authority

2   regarding the "in-custody" issue, including <u>Beheler</u> and <u>Mathiason</u>.  <u>Stanley</u>, 167 Ariz. at

3   523, 809 P.2d at 948.  Considering the discussion in its entirety, this Court concludes that the

4   Arizona Supreme Court applied the correct legal standard when analyzing whether Petitioner

5   was "in custody" for <u>Miranda</u> purposes.

6        Petitioner next argues that the state court's ruling involved an unreasonable

7   application of clearly established federal law because it ignored the fact that at the time he

8   confessed and invoked his <u>Miranda</u> rights, the tenor of Officer Saravo's questions had

9   become increasingly accusatory, indicating that Saravo had focused his suspicions on

10  Petitioner.  (Dkt. 52 at 14-16.)  According to Petitioner, "At this juncture, a reasonable

11  person would harbor the belief that he was not free to leave, regardless of what transpired at

12  earlier stages of the interrogation." (<u>Id.</u> at 14.)  Petitioner argues that the Arizona Supreme

13  Court "fails to address these critical facts" and that its decision "amounts to an unreasonable

14  application of clearly established federal law." (<u>Id.</u> at 15-16.)  Again, this Court disagrees.

15       As previously noted, the United States Supreme Court has consistently held that an

16  officer's subjective beliefs, including whether he considers the person being questioned a

17  suspect, is irrelevant to the objective "in-custody" test unless the officer somehow discloses

18  his suspicions to the interviewee.  <u>See Stansbury</u>, 511 U.S. at 325.  The <u>Stansbury</u> Court

19  explained:

20       The weight and pertinence of any communications regarding the officer's
         degree of suspicion will depend upon the facts and circumstances of the
21       particular case. In sum, an officer's views concerning the nature of an
         interrogation, or beliefs concerning the potential culpability of the individual
22       being questioned, may be one among many factors that bear upon the
         assessment whether the individual was in custody, but only if the officer's
23       views or beliefs were somehow manifested to the individual under
         interrogation and would have affected how a reasonable person in that position
24       would perceive his or her freedom to leave.

25  <u>Id.</u>

26       The Arizona Supreme Court considered the focus of the investigation to be a factor

27  "indicative of custody," as revealed in the court's discussion of the <u>Carter</u> factors, one of

28

which is "whether the investigation had focused on the accused."[6] <u>Stanley</u>, 167 Ariz. at 523, 809 P.2d at 948 ("Applying the *Carter* factors to this case, we agree that Stanley was not in custody"). The court found that, "At the time of questioning, the investigator's focus was on a search for missing persons." <u>Id.</u> The court further observed that, "While Saravo had his suspicions about Stanley, there was no direct evidence of his involvement." <u>Id.</u>

The Arizona Supreme Court did not explicitly address the issue of whether Saravo's questions – which, as Petitioner correctly notes, became more accusatory as the interview proceeded – "would have affected how a reasonable person in [Petitioner's] position would perceive his or her freedom to leave." <u>Stansbury</u>, 511 U.S. at 325. This Court finds, however, that because Investigator Saravo's beliefs regarding Petitioner's culpability were manifested to Petitioner, his focus on Petitioner as a suspect is "one among many factors that bear upon the assessment whether [Petitioner] was in custody." <u>Stansbury</u>, 511 U.S. at 325.

Other factors clearly suggest that the interrogation of Petitioner was not custodial. As the Arizona Supreme Court noted, during the interview Petitioner was not restrained in any way; he was allowed to leave the office unaccompanied to use the restroom and get a drink. He smoked throughout the interview and carried a hunting knife in his belt. <u>Stanley</u>, 167 Ariz. at 523, 809 P.2d at 948. (<u>See</u> R.T. 5/15/87 at 453-54.) Saravo did not display a weapon, and Petitioner was not subjected to any form of threats or intimidation. (R.T. 5/15/87 at 453-54.) There were never more than two officers present in the office. (<u>Id.</u> at 502.) During the interview, Saravo was seated at his desk, with the Petitioner seated across from him, closer to the door. (<u>Id.</u> at 314.) Saravo testified that, until the point at which he confessed to the shootings, Petitioner was not under arrest and was free to leave. (<u>Id.</u> at 469.)

Furthermore, Petitioner himself initiated the police investigation by reporting the

---

[6]     The factors enumerated in <u>Carter</u>,145 Ariz. at 105, 700 P.2d at 492, include: (1) whether the objective indicia of arrest are present; (2) the site of the interrogation; (3) the length and form of the investigation; and (4) whether the investigation had focused on the accused.

"disappearance" of his wife and daughter.  (See R.T. 5/14/87 at 4.)  After Mrs. Stanley's sisters, conducting their own search, informed the police that they had located what looked like blood in the Stanley vehicle, Petitioner voluntarily met the officers at his shop and consented to a search.  (R.T. 5/15/87 at 307-08.)  According to the testimony of Officer Wright, Petitioner was "insistent" that officers conduct the search of his shop and appeared "very cooperative and seemed wanting [sic] us to do whatever was necessary to find out – determine what was happening."  (Id. at 308.)  When informed that blood had been found inside the car, Petitioner "made a comment of, 'Oh, God, I hope it's not blood.'"  (Id. at 308-09.)  He then assisted officers in an unsuccessful search for the pistol he said he kept in the shop but which was apparently now missing.  (Id. at 309-10.)  At this point, Petitioner agreed to speak with Saravo and voluntarily accompanied him from the crowded shop to an office in the nearby county building.  (Id. at 447.)

Petitioner, a 23-year-old husband, father, and business owner, created a scenario in which he was seeking assistance from the police in a search for his missing wife and child, and he continued to play his role, cooperating with the authorities, as the investigation ran its course.  The Court finds that a reasonable person in Petitioner's position would not have felt himself to be in police custody when he was interviewed by investigators.  The Court further concludes that the record supports the Arizona Supreme Court's determination that Petitioner was not in custody, notwithstanding the court's silence on the issue of the effect of Saravo's accusatory questions.  This conclusion is supported by the United States Supreme Court's decision in Yarborough v. Alvarado, 541 U.S. 652.

In Alvarado, the Court discussed the application of § 2254(d)(1) to a state court's determination of the custody issue.  Alvarado, age 17, was suspected of being involved in a carjacking and murder.  541 U.S. at 656.  In response to a message from an investigator, Cheryl Comstock, Alvarado's parents brought him to the police station where Comstock questioned him in a small interrogation room.  Id.  Only Comstock and Alvarado were present at the interview, which lasted about two hours, and Alvarado was not given a

Miranda warning.  Id.

In the beginning of the interview, Alvarado denied being present at the shooting.  Id. at 657.  However, he began to change his story as Comstock repeatedly indicated that she had information about his involvement and believed that he was not being honest.  Id. at 657-58.  Alvarado finally admitted to being present at the carjacking with the shooter.  Id. at 658.  He testified at trial and was impeached with his statement to Comstock.  Id.

The state appellate court rejected Alvarado's claim that his statement to Comstock should have been suppressed.  Id. at 659.  The court ruled that a Miranda warning was not required because Alvarado was not in custody.  Id.  On federal habeas review, the Ninth Circuit concluded that the state court had erred by failing to take into account Alvarado's youth and inexperience in determining the custody issue.  Id. at 659-60.  The United States Supreme Court reversed.  Id. at 655.

The Court began its analysis by reviewing the applicable "clearly established federal law," as set forth in Mathiason, Beheler, McCarty, Stansbury, and Thompson.  Id. at 661-63.  The Court then articulated the standard of review required by AEDPA: whether "the state-court adjudication of the claim 'involved an unreasonable application' of clearly established law when it concluded that Alvarado was not in custody."  Id. at 663.  The Court also explained that, because the custody inquiry consists of the application of a "general standard to a specific case," courts have considerable leeway in making such determinations.  Id. at 664.

In reviewing the circumstances of Alvarado's interrogation, the Court listed the factors weighing for and against a determination that he was in custody for Miranda purposes.  Id. at 664-65.  The following facts suggested that Alvarado was not in custody: the police did not transport him to the station or require him to appear at a particular time, they did not threaten him or suggest that he would be placed under arrest, and his parents remained in the lobby during the interview.  Id. at 664.  In addition, during the interview Comstock focused on the co-defendant's role in the crimes and, rather than pressuring

Alvarado with the threat of arrest, appealed to his interest in telling the truth and being helpful. Id. Finally, Comstock twice asked Alvarado if he wanted to take a break, and at the end of the interview, Alvarado was allowed to go home. Id. Factors suggesting that Alvarado was in custody included the length of the interview, the fact that Comstock did not tell Alvarado that he was free to leave, the fact that Alvarado was taken to the station by his parents rather than arriving there of his own accord, and, if true, the fact that Comstock denied the request of Alvarado's parents to be present with their son at the interview. Id. at 665.

Given these circumstances, the Court concluded that "fair-minded jurists could disagree over whether Alvarado was in custody." Id. at 664. Therefore, the state court's application of federal law could not be called "objectively unreasonable" under the deferential standard mandated by AEDPA. Id. The Court explained:

> These differing indications lead us to hold that the state court's application of our custody standard was reasonable. The Court of Appeals was nowhere close to the mark when it concluded otherwise. Although the question of what an "unreasonable application" of law might be difficult in some cases, it is not difficult here. The custody test is general, and the state court's application of our law fits within the matrix of our prior decisions. We cannot grant relief under AEDPA by conducting our own independent inquiry into whether the state court was correct as a *de novo* matter. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [the law] incorrectly." Relief is available under § 2254(d)(1) only if the state court's decision is objectively unreasonable.

Id. at 666 (quoting Visciotti, 537 U.S. at 24-25).

Applying the analysis undertaken by the Alvarado Court to the circumstances surrounding Petitioner's interview, this Court concludes that the state court's determination that Petitioner was not in custody was not objectively unreasonable. During the interview, Investigator Saravo asked Petitioner questions about the events surrounding the disappearance of his wife and daughter and Petitioner responded with the story he had first provided to the Clarkdale police the night before. (Dkt. 57, Ex. B at 2-13.) As the interview progressed, Saravo sought Petitioner's consent to search his home; in doing so he

1    emphasized that Petitioner was not under arrest.  (Id. at 21.)  Petitioner consented to the

2    search.  (Id. at 24-25.)  Petitioner asked if he could go get a drink and was allowed to do so.

3    (Id. at 25.)  The interview had been in progress for just under an hour when Petitioner made

4    his first incriminating statement and invoked his Miranda rights.  (Id. at 31.)  Saravo stopped

5    the interview.  (Id.)  He did not place Petitioner under arrest.  (Id.)  Petitioner remained in the

6    office alone and he did not ask to leave.  (Id.)  Shortly thereafter Saravo returned and

7    informed Petitioner of the evidence that had been located at the shop.  (Id. 31-32.)  He

8    explained to Petitioner that he did not have to answer any questions, and in fact Petitioner

9    did not respond to Saravo's statements or inquiries.  (Id. at 32.)  Petitioner remained in the

10   office.  (R.T. 5/15/87 at 462.)  When Saravo again returned he asked the visibly upset

11   Petitioner if he was all right.  (Id.)  At that point, Petitioner confessed to killing his wife and

12   daughter.  (Id. at 463.)  This statement occurred at around 8:10 p.m., or an hour and ten

13   minutes into the interview.  (See id. at 516.)  These facts supports the Arizona Supreme

14   Court's determination that Petitioner was not in custody.

15        In Alvarado, the investigator made it clear that she believed the defendant was

16   involved in the crime and insisted that his version of the events was not truthful; nonetheless,

17   her increasingly skeptical and accusatory questions were not sufficient to render

18   unreasonable the state court's determination that the interview was not custodial.  541 U.S.

19   at 664. Similarly, this Court rejects Petitioner's argument that the Arizona Supreme Court's

20   resolution of the custody issue was unreasonable because the court failed to address the fact

21   that Investigator Saravo's questions had communicated to Petitioner that he was the focus

22   of the investigation.

23        The Arizona Supreme Court's determination that Petitioner was not in custody when

24   he confessed to killing his wife and daughter was neither contrary to nor an unreasonable

25   application of clearly established federal law.  Therefore, Petitioner is not entitled to relief

26   on Claim 1.

27

28

**Claim 2:**     **Petitioner's right to effective assistance of counsel under the Sixth and Fourteenth Amendments was violated by trial counsel's failure to investigate and present a defense based on the absence of premeditation.**

**Claim 3:**     **Petitioner's right to effective assistance of counsel under the Sixth and Fourteenth Amendments was violated by trial counsel's failure to provide Petitioner's court-appointed psychiatrists with a copy of Petitioner's interview with a jail psychiatrist.**

Petitioner alleges that trial counsel rendered constitutionally deficient representation because he failed to present a coherent defense based on absence of premeditation. (Dkt. 52 at 16, 25-32.)   He further alleges that counsel was ineffective for not providing court-appointed experts with details of a post-arrest interview with a jail psychiatrist. (Id. at 33-34.)   Petitioner raised these claims in his PCR petition, and the state court denied relief. (M.E. 5/19/97 at 4-8.)

To prevail on a claim of ineffective assistance of counsel ("IAC"), a petitioner must show that counsel's representation fell below an objective standard of reasonableness and that the deficiency prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687-88 (1984).   The inquiry under Strickland is highly deferential, and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Bell v. Cone, 535 U.S. 685, 698 (2002) (quoting Strickland, 466 U.S. at 689).   To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

When a state court has addressed the merits of a petitioner's claim of federal constitutional error, a federal court may grant habeas relief only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."   28 U.S.C. § 2254(d)(1); see Yarborough v. Gentry, 540 U.S. 1 (2003); Woodford, 537 U.S. at 19.   In denying relief on

1   Petitioner's IAC claims, the state PCR court correctly identified <u>Strickland</u> as the governing

2   legal rule. (M.E. 5/19/97 at 6-7.)  Therefore, the question for this Court is whether the PCR

3   court "applied <u>Strickland</u> to the facts of his case in an objectively unreasonable manner."

4   <u>Cone</u>, 535 U.S. at 698-99.

5            <u>Relevant Facts:</u>

6            After his arrest on June 20, 1986, Petitioner was examined by Dr. Karleen Hammitt,

7   a psychiatrist at the Yavapai County Jail. (M.E. 5/19/97 at 6-7.)  During the interview, which

8   occurred the next morning, Dr. Hammitt detected "no indicators of psychotic thought

9   processes" nor any "signs and symptoms that are normally part of a psychotic diagnosis."

10  (Dkt. 53, Ex. 9 at 25.)   Dr. Hammitt explained that while she observed grief and sorrow on

11  Petitioner's part, "Nothing he said indicated to me any degree of remorse per se." (<u>Id.</u> at 24.)

12  With respect to the killings, Petitioner told Dr. Hammitt that he "flew off the wall and shot

13  them." (<u>Id.</u> at 19.)  Petitioner described his mental state during the shootings as "like he was

14  watching and like he wasn't even there." (<u>Id.</u> at 31.)

15           In August 1986, prior to trial, defense counsel moved for a mental examination

16  pursuant to Ariz. R. Crim. P. 11. (ROA-PCR 12.)  Over the prosecution's objection, the trial

17  court granted the motion and appointed Drs. Paul Bindelglas and Dean Gerstenberger, both

18  psychiatrists, to perform the evaluations. (ROA-PCR 15.)  The court subsequently appointed

19  Dr. Joseph Stewart, a psychologist, and Dr. Leonardo Garcia-Bunuel, another psychiatrist.[7]

20  (ROA-PCR 28, 36, 40, 42.)  None of these experts reviewed Dr. Hammitt's report because

21  defense counsel had successfully moved, over the prosecution's objection, to preclude Dr.

22  Hammitt's testimony on the basis of physician-patient privilege. (M.E. 5/19/97 at 7.)

23           At trial, counsel focused his defense on Petitioner's state of mind at the time of the

24  offenses.  Counsel presented this aspect of his defense through the testimony of Drs. Garcia-

25  Bunuel and Bindelglas.  Counsel used this testimony not only to address the issue of legal

26  _____

27       [7]      Petitioner was also administered a neurological examination, including an
    EEG. (ROA-PCR 51, 53.)  The results of the exam were normal. (Dkt. 57, Ex. E.)
28

insanity but to advance the theory that Petitioner suffered from a "dissociative reaction" at the time of the murders and therefore did not act with premeditation.

Dr. Garcia-Bunuel testified that although Petitioner was under the influence of alcohol, marijuana, and cocaine at the time he killed his wife and daughter, he "was not psychiatrically ill" and "was able to appreciate right and wrong as applied to his actions." (R.T. 7/7/87 at 1582; see ROA-PCR 48.)  Dr. Garcia-Bunuel also testified that Petitioner "may have suffered from a dissociative reaction.  This, however, is unlikely." (Id.)  Defense counsel questioned Dr. Garcia-Bunuel further on the issue of dissociative reaction; Garcia-Bunuel acknowledged that it was a recognized disorder and that, although he felt it was unlikely that Petitioner had experienced it, he could not rule out the possibility. (Id. at 1584.) He conceded that other psychiatrists with different expertise and experience may be more capable of diagnosing the disorder. (Id. at 1585-86.)  He also testified that it is "very rare" for a dissociative reaction to result in violence. (Id. at 1586.)  On redirect examination, defense counsel inquired about a related phenomenon called "brief reactive psychosis." (Id. at 1591.)  Dr. Garcia-Bunuel indicated that it was unlikely but possible that Petitioner experienced this condition at the time of the killings. (Id.)

Defense counsel also called Dr. Bindelglas, who had more experience than Dr. Garcia-Bunuel treating patients with dissociative reaction.  Dr. Bindelglas testified that, in his opinion,

> at the time of the offense, Milo Stanley was in – in, ah, a form of psychotic dissociative reaction, that his ability to fully appreciate what was going on, to be able to control his behavior even if he had an inkling of what was going on, was markedly impaired to the degree that he was truly incompetent at that time.

(R.T. 7/8/87 at 1606.)  Defense counsel focused his questions to Dr. Bindelglas on the phenomenon of dissociative reaction or brief psychotic reaction.  In explaining his diagnosis of Petitioner as having experienced a dissociative reaction, Dr. Bindelglas stated that Petitioner's "mental state at the time . . . had such features of cloudiness and fuzziness of thinking combined with auditory hallucinations, voices speaking to him and directing him

1   . . ." (Id. at 1608.)  Dr. Bindelglas further indicated that Petitioner "has a history of . . .

2   having various voices in his head that he sought – felt was the devil."  (Id.)

3          On cross-examination, Dr. Bindelglas acknowledged that in his written report he

4   diagnosed Petitioner as suffering from psychosis, schizo-affective disorder with paranoid

5   ideation, hallucinations, and depression, but that the report did not specifically diagnose

6   Petitioner with a "dissociative reaction."  (Id. 1626-27; see ROA 44.)  Dr. Bindelglas

7   indicated that his discussion about "dissociative reaction" during direct examination was a

8   response to counsel's questions, but that his report was not inconsistent with such a

9   diagnosis. (Id.)

10         Dr. Bindelglas also testified that Petitioner met the legal standard for insanity because

11  his condition made it "impossible for him to really grasp the full quality and enormity of

12  what he was doing." (Id. at 1631.) Dr. Bindelglas explained that at the time of the shootings

13  Petitioner "felt that he was outside of his body, that some other force was actually doing what

14  was going on" (id. at 1632), that Petitioner "perceived himself as almost outside of the body

15  and that the body itself was doing the shooting" (id. at 1633), and that Petitioner felt that he

16  was being directed by the devil or demons (id. at 1634).

17         The State called Drs. Stewart and Gerstenberger in rebuttal.  Dr. Stewart testified that

18  in his opinion Petitioner suffered from a mental disease or defect, in the form of chemical

19  dependency, but that he understood the nature and quality of his actions at the time of the

20  shootings and knew they were wrong.  (Id. at 1647; see ROA-PCR 43.)  Dr. Stewart

21  indicated that he could not rule out a finding that Petitioner experienced a dissociative

22  reaction, but did not feel it was likely.  (Id. at 1648.)  On cross-examination, defense counsel

23  challenged Dr. Stewart's credentials, and Dr. Stewart acknowledged that diagnosing a

24  condition such as dissociative reaction was not within his area of expertise.  (Id. at 1651.)

25         Dr. Gerstenberger testified that in his opinion Petitioner did not suffer from a mental

26  disease or defect and that at the time of the offense he understood the nature and quality of

27  his actions and knew they were wrong.  (Id. at 1659-60; see ROA 45.)  Dr. Gerstenberger

28

- 23 -

testified that he did not believe Petitioner experienced a dissociative reaction at the time of the killings.  (Id. at 1662.)  Petitioner's description of the events did not support such a finding, and the condition is not one that occurs only once for a brief period of time. (Id. at 1663.)  On cross-examination Dr. Gerstenberger conceded that he could not completely rule out a diagnosis of dissociative reaction.  (Id. at 1667.)

During the state PCR proceedings, in support of his IAC claims, Petitioner provided Drs. Bindelglas and Garcia-Bunuel with a transcript of his post-arrest interview with Dr. Hammitt, and asked each to opine about the effect of this "new" information on their original opinions.  In his affidavit, Dr. Bindelglass stated that, had he been aware of Petitioner's comments to Dr. Hammitt, he would have placed greater emphasis on dissociative reaction in preparing his report and revised his opinion to include "very substantial doubts that Petitioner premeditated his actions."  (ROA-PCR 122 at 5.)  Dr. Garcia-Bunuel similarly attested that if he had been afforded access to the Hammitt interview he would have found it "highly probable" that Petitioner had suffered from a dissociative reaction and met the legal standard for insanity.  (ROA-PCR 121 at 5.)

In denying relief on Petitioner's IAC claims, the PCR court did not expressly address Petitioner's arguments concerning counsel's deficient presentation of a premeditation defense.  Instead, it focused on counsel's failure to provide Dr. Hammitt's interview to the other mental health experts, and ruled that counsel's handling of the information contained in the Hammitt interview "was a matter of reasoned trial strategy." (M.E. 5/19/97 at 7.)  The court concluded that the information contained in the interview did not provide unqualified support for Petitioner's dissociative-reaction hypothesis because Dr. Hammitt believed that Petitioner's sensation of watching the shootings was not a manifestation of psychosis but likely the product of "whatever state of intoxication he was involved in at the time as well as the fact that most people don't ever believe that they themselves are going to be in the situation like he found himself in when he sobered up." (Id.; Dkt. 53, Ex. 9 at 31.)  The court found, therefore, that "Dr. Hammitt's interview could have undermined the claim of a

1   dissociative reaction." (Id.)  The PCR court further concluded that Petitioner had "failed to

2   show that trial counsel did not properly investigate [his] state of mind at the time of the

3   offense." (Id.)  The Arizona Supreme Court denied review of Petitioner's IAC claims

4   without explanation.

5       Analysis:

6       Petitioner asserts numerous grounds to support his argument that the PCR court's

7   rulings were objectively unreasonable under 28 U.S.C. § 2254(d)(1).  With respect to Claim

8   2, Petitioner contends that the PCR court erred in attaching significance to the likelihood that

9   the Hammitt evidence would have undermined the insanity defense "because there is no

10  conceivable way that the Petitioner could have sustained his burden of proving insanity by

11  clear, cogent, and convincing evidence."  (Id. at 29.)  Therefore, Petitioner asserts,

12  reasonably competent counsel would have concluded that "there was basically nothing to

13  lose" by offering the Hammitt evidence to support a lack-of-premeditation defense and the

14  PCR court's summary denial of the issue underlying Claim 2 was objectively unreasonable.

15  (Id.)  By contrast, Petitioner contends the PCR court unreasonably failed to acknowledge, in

16  assessing the issue underlying Claim 3, that Dr. Hammitt's interview with Petitioner would

17  have led Dr. Garcia-Bunuel to corroborate Dr. Bindelglas's dissociative-reaction opinion,

18  thereby providing "a reasonable probability of convincing the trier of fact that he met the test

19  for insanity."  (Dkt. 52 at 34.)

20      As set forth below, the Court concludes that Petitioner's arguments are not well taken.

21  In challenging these aspects of trial counsel's guilt-stage performance, Petitioner has

22  mischaracterized counsel's handling of the premeditation issue and has failed to take into

23  account the extent to which counsel's presentation of the issue through the use of expert

24  testimony was circumscribed by state law.

25      *Claim 2 - Lack of Premeditation as Primary Defense.*

26      In order for trial counsel's handling of the premeditation issue to be deemed

27  ineffective assistance under Strickland, Petitioner must show that counsel's performance was

28

not only objectively unreasonable but prejudicial. 466 U.S. at 687, 688. As previously noted, in evaluating an IAC claim, "Judicial scrutiny of counsel's performance must be highly deferential," id. at 689, and there is a presumption that counsel's trial tactics constituted "sound trial strategy." Id.; see Gentry, 540 U.S. at 8 ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect"). Moreover, under the AEDPA, Petitioner must make the additional showing that the PCR court's ruling that counsel was not ineffective constituted an unreasonable application of Strickland. 28 U.S.C. § 2254(d)(1). Petitioner has satisfied neither the Strickland test nor the deferential standard of § 2254(d)(1).

In his merits brief, Petitioner identifies thirteen instances of deficient performance that, taken together, establish counsel's failure to present a coherent defense based on the absence of premeditation. These include trial counsel's failure to: (1) identify lack of premeditation as a defense in his opening statement; (2) call Dr. Hammitt as a witness; (3) examine Dr. Bindelglas as to whether Petitioner's mental illness rendered him incapable of premeditating the crimes; (4) object to the prosecution's suggestion that premeditation is established by a period of time; (5) move for directed verdict on the issue of premeditation; (6) discuss in closing argument the evidence conflicting with the State's theory of premeditation; (7) argue lack of motive; (8) argue lack of planning; (9) challenge the murder weapon's capacity to fire in rapid succession; (10) assert an alternative explanation for the victims' contact wounds (due to close quarters of the vehicle in which they were killed); (11) argue that Officer Wright neglected to record or mention to the defense investigator Petitioner's inculpatory statement concerning the reason he killed his daughter; (12) argue that the killings occurred as a result of a fight over Petitioner's drinking; and (13) argue the State's burden to prove premeditation and absence of heat of passion beyond a reasonable doubt. (Dkt. 52 at 25-27.) After careful review of the record, the Court concludes that trial counsel's representation with respect to premeditation was neither deficient nor prejudicial.

As an initial matter, the Court notes that, contrary to Petitioner's contention, trial

counsel did raise lack of premeditation as a defense throughout his presentation.  For example, in his closing argument counsel urged the jury, if it rejected the insanity defense, to find Petitioner guilty of manslaughter or second-degree murder, as opposed to first-degree murder, on the grounds that the evidence did not support a finding of premeditation:

> Mr. Hastings [the prosecutor] very intelligently presented his case to you here, but there is a big issue that he has left out, and what is that?  Well, first of all you're also going to get an instruction on murder in the second degree and you are going to get an instruction on manslaughter for Susan [Mrs. Stanley].
>
> . . . Murder second degree, basically, the difference is that there is not premeditation.  There could have been argument that could have been involved, a weapon could have been demonstrated, could have been seen, and someone without premeditation, without thinking just acting out in that fashion could have fired and shot and killed.
> . . . .
>
> But if you can't see the insanity, which I implore you to do, a manslaughter and a murder second degree is a much fairer circumstance, and you don't have any evidence otherwise.

(R.T. 7/10/87 at 1764-65.)

In addition to presenting expert testimony concerning Petitioner's mental state, counsel's trial strategy included a vigorous challenge to one of the key pieces of evidence supporting the premeditation element of the murder charges – the testimony of Officer Wright.  Wright, who was present at the county complex during Petitioner's interview, testified that Petitioner had stated in Wright's presence that "he shot his daughter because she had seen what he had done" but had not shot his infant son, who was also in the car, because the baby "could not tell anybody what he had done." (R.T. 7/2/87 at 1372.)  Recognizing the significance of such testimony, defense counsel repeatedly attacked Officer Wright's credibility, emphasizing the fact that Wright failed to make a contemporaneous note of Petitioner's statements.  (Id. at 1376-1403.)

Throughout the trial, defense counsel challenged the professionalism of the police investigation and the credibility of the officers.  He attacked Officer Wright on cross-examination (id.) and in his closing argument (see R.T. 7/10/87 at 1756-59).  In addition, counsel presented the testimony of defense investigator Arthur Hanratty, a former police

detective, for the sole purpose of challenging the investigation, including Wright's failure to record Petitioner's statement or to mention the statement when interviewed by Hanratty. (R.T. 7/7/87 at 1531-33.)

Counsel's attack on Officer Wright's crucial testimony continued when, contrary to Petitioner's claim, counsel moved for a judgment of acquittal pursuant to Rule 20 of the Arizona Rules of Criminal Procedure. (Id. at 1675.) As one of the grounds for his motion, counsel cited the lack of evidence supporting a finding of premeditation with respect to the killing of either victim:

> Furthermore, there has been only admissions brought in through the police officers through possibly unsubstantiated bases as they failed to document information in their reports and based upon the totality of the circumstances that could make the basis for a murder of first degree on either charge.

(Id. at 1676.)

Also without merit are Petitioner's criticisms of specific aspects of counsel's performance. For example, Petitioner inaccurately characterizes counsel's alleged failure to present Petitioner's attempts to conceal evidence as so ineffectual that they "indicated a lack of planning." (Dkt. 52 at 26.) In his closing argument, counsel in fact made the point that the bloody items found at the garage "certainly weren't cleverly hidden" (R.T. 7/10/87 at 1750), and that the haphazard manner in which Petitioner disposed of the evidence did not support a finding that "he had any real scheme like [the prosecutor] is talking about" (id. at 1762). This Court cannot fault counsel, whose defense strategy was to challenge Petitioner's mental culpability, for choosing not to draw further attention to the actions Petitioner undertook to conceal the evidence of his crimes.

Other decisions by trial counsel, which Petitioner describes as deficient, can with equal plausibility be characterized as tactically sound. Petitioner criticizes counsel for not arguing that premeditation was lacking because the shots were fired in rapid succession and that the presence of contact wounds was a function of the enclosed space in which the victims were shot rather than a product of a deliberate action taken by Petitioner. (Dkt. 52

1    at 26.)

2      At trial, defense counsel chose not to ask the medical examiner any questions. (R.T.

3    7/2/87 at 1480.) The details of the medical examiner's testimony support a finding that

4    counsel's decision not to pursue the issue was sound. Mrs. Stanley, who was sitting next to

5    Petitioner, was shot in the head and face three times; the wounds were in various positions

6    and each shot was fired from a different distance.[8] (Id. at 1471-72.) However, both she and

7    her daughter, who was seated behind Petitioner, bore contact wounds, indicating that the gun

8    barrel had been pressed into the victims' scalp. (Id. at 1472.) Given this evidence, counsel

9    might have felt that he could not credibly argue that the shots were fired randomly or that the

10   position of the wounds was accidental. Counsel, who objected vigorously to the admission

11   of post-mortem photos of the child (id. at 1477-78), might also have felt that it was not

12   beneficial to Petitioner's defense to dwell on the characteristics and placement of the victims'

13   wounds.

14     Petitioner also contends that trial counsel erred by not objecting to the prosecutor's

15   explanation of premeditation. (Dkt. 52 at 20, 25.) In his closing argument, the prosecutor

16   informed the jury that,

17     premeditation means that the defendant's intention or knowledge existed
18     before the killing long enough to permit reflection. However, the time for
       reflection must be longer than the time required merely to form the intent or
19     knowledge that conduct would cause death.

20     Now, premeditation doesn't take a week – doesn't need to take a day
       or an hour or even a minute or even a second. You can premeditate in the
21     amount of time it takes to form two successive thoughts in the mind. Basically

22   _____

23     [8]  Petitioner shot Mrs. Stanley in the upper lip, behind her left ear, and in the top
     of the head. (R.T. 7/2/87 at 1468-70.) The shot to her face was fired from a distance of less
24   than one foot. (Id. at 1471.) The shot that struck behind her ear was fired from "outside the
     range of three or more feet." (Id. at 1472.) The wound to the top of her head was a so-called
25   "contact wound," indicating that when Petitioner fired the weapon the barrel was in contact
     with her scalp. (Id. at 1472.) Petitioner shot his daughter once in the top of the head; the
26   wound was in approximately the same position as the wound on Mrs. Stanley's head. (Id.
     at 1474.) The child's injury was a "hard" contact wound, produced by a greater amount of
27   pressure being applied to the weapon as it was pressed against the girl's head. (Id.)

28

1   time to reflect.  You can have premeditation like that.  Long enough just to say
2   what am I doing or do I want to do this?  That's it.  That's all the time it takes
    to premeditate.

3   (R.T. 7/10/87 at 1731.)  Petitioner characterizes this discussion as inappropriately asserting

4   that premeditation requires only the passage of time, not actual reflection.  The Court

5   disagrees.

6       At the time of Petitioner's trial, A.R.S. § 13-1101(1) defined premeditation as follows:

7       "Premeditation" means that the defendant acts with either the intention or the
        knowledge that he will kill another human being, when such intention or
8       knowledge precedes the killing by a length of time to permit reflection.  An act
        is not done with premeditation if it is the instant effect of a sudden quarrel or
9       heat of passion.

10  Arizona courts had further explained that, "The necessary premeditation, however, may be

11  as instantaneous as successive thoughts of the mind, and may be proven by either direct or

12  circumstantial evidence."[9]  State v. Kreps, 146 Ariz. 446, 449, 706 P.2d 1213, 1216 (1985);

13  see State v. Spears, 184 Ariz. 277, 289, 908 P.2d 1062, 1074 (1996); State v. Lopez, 158

14  Ariz. 258, 262, 762 P.2d 545, 549 (1988);  State v. Sellers, 106 Ariz. 315, 316, 475 P.2d 722,

15  724 (1970).

16      In this case, the trial court instructed the jury that "premeditation means that the

17  defendant's intention or knowledge existed before the killing long enough to permit

18  reflection.  However, the time for reflection must be longer than the time required merely to

19  form the intent or knowledge that conduct will cause death." (R.T. 7/10/87 at 1784-85.)  The

20  prosecutor's comments accurately stated the law and reflected the trial court's jury

21  instruction.  Nothing in the prosecutor's argument or the court's instructions inaccurately

22  suggested that the State needed only to prove the time element of reflection in lieu of actual

23  premeditation.  Because the prosecutor's comments were appropriate, trial counsel did not

24

25  _____

26      [9]    While "instantaneous as successive thoughts" remains a sound
    conceptualization of the time element of premeditation, subsequent decisions of the Arizona
27  Supreme Court have "discouraged" the phrase's use in jury instructions.  See State v.
    Thompson, 204 Ariz. 471, 479, 65 P.3d 420, 428 (2003).

28
                                        - 30 -

1    err by failing to object.

2    Having considered all of Petitioner's arguments concerning counsel's handling of the

3    premeditation issue, the Court concludes that Petitioner has not shown that counsel's

4    representation fell below an objective standard of reasonableness. Strickland, 466 U.S. at

5    687-88. In addition, the Court finds that Petitioner has not shown prejudice from counsel's

6    alleged deficiencies.

7    Several pieces of circumstantial evidence supported a showing of premeditation. In

8    addition to his statement to Officer Wright about killing his daughter because she had

9    witnessed her mother's murder, evidence of similarly-placed contact wounds on the victims

10   heads suggested that the shootings were not the effect of a sudden quarrel or heat of passion.

11   Petitioner's subsequent conduct also presented challenges to a defense based on absence of

12   premeditation.

13   Petitioner told Investigator Saravo that he shot his wife and daughter inside their

14   vehicle. (R.T. 7/1/87 at 1292.) He was in the driver's seat, his daughter was sitting behind

15   him, and Mrs. Stanley was in the front passenger seat; the baby was behind Mrs. Stanley.

16   (Id. at 1292-93.) The vehicle was parked, and Petitioner and his wife were arguing. (Id. at

17   1292.) His gun, a .22 Ruger pistol, was between the seats. (Id. at 1293.) He shot his wife

18   first, then his daughter from between the seats "as she started to look up." (Id.) He then

19   pushed the bodies off the edge of the road. (Id. at 1294.) When he returned home he

20   unloaded his son and some groceries from the vehicle, hid the gun under his waterbed, and

21   wiped the blood off the steering wheel. (Id. at 1296, 1298-99.) Petitioner told Saravo that

22   he had consumed four four-packs of wine coolers prior to meeting his wife at 6:30 or 7:00

23   p.m. (Id. at 1296.) He estimated that the shootings occurred at around 7:30 or 8:00 p.m. (Id.)

24   At around 10:45 p.m. that night, Petitioner rented a "racy" video from a convenience

25   store in Clarkdale. (R.T. 7/2/87 at 1438-40.) The clerk testified that Petitioner asked him

26   if he had seen a woman and a little girl come into the store; Petitioner then "mentioned

27   something to the effect that, well, his wife must have gotten pissed off and taken off." (Id.

28

at 1444.)  The clerk further testified that Petitioner did not seem distressed or upset, and that he did not appear to be intoxicated or "under the influence of anything."  (Id. at 1445.)  The clerk, who was positioned within a foot-and-a-half to two feet of Petitioner, could not smell alcohol, and testified that Petitioner did not stagger or slur his speech.  (Id. at 1444-45.)

At about 11:30 p.m., Petitioner contacted the Clarkdale Police Department to report that his wife and daughter were missing; according to Petitioner, they had gone for a walk and had not returned.  (See R.T. 6/30/87 at 1121-22.)  Officer John Kubrock, who spoke with Petitioner at about 11:45 p.m. to discuss the missing persons report, testified that he could detect a "moderate" odor of alcohol coming from Petitioner but that Petitioner did not appear to be intoxicated.  (Id. at 1127.)  Petitioner admitted to having consumed "a little bit" of alcohol.  (Id. at 1128.)

Because trial counsel was faced with significant evidence that supported a finding of premeditation, the Court concludes that Petitioner was not prejudiced by trial counsel's decision to raise a defense that challenged Petititioner's state of mind at the time of the murders but did not focus solely on the issue of premeditation.

Moreover, aside from the information gathered in Dr. Hammitt's interview with Petitioner, it is not clear what evidence trial counsel failed to put before the jury to support an absence-of-premeditation defense.  Counsel presented evidence and argued in support of his position that Petitioner was insane, and therefore not guilty of the offenses, *and* that the killings were not premeditated.  In doing so, counsel placed before the jury the type of information Petitioner now claims was neglected.  In addition, as discussed infra at p. 34-35, while some of the information from the Hammitt interview may have supported Dr. Bindelglas's diagnosis of a dissociative reaction, trial counsel was prohibited by Arizona law from proffering an expert opinion that a dissociative reaction at the time of the offense rendered Petitioner incapable of acting with premeditation.

The PCR court rejected Petitioner's claim that counsel was ineffective at the guilt stage of trial, finding that "petitioner has failed to show that trial counsel did not properly

1   investigate the defendant's state of mind at the time of the offense." (M.E. 5/19/97 at 7.)

2   Having reviewed the record and considered the arguments raised in Claim 2, this Court

3   concludes that the ruling of the PCR court did not involve an unreasonable application of

4   clearly established federal law as set forth in Strickland. Therefore, Petitioner is not entitled

5   to relief on Claim 2.

6       *Claim 3 - Dr. Hammitt's Interview.*

7       Contrary to Petitioner's argument, the PCR court did not "fail[] to consider the

8   circumstances surrounding counsel's so-called tactical decision" to exclude Dr. Hammitt's

9   testimony. (Dkt. 52 at 32.) Petitioner's argument is premised on the significance of trial

10  counsel's failure to disclose to Drs. Bindelglas and Garcia-Bunuel Petitioner's statement to

11  Dr. Hammitt regarding his reported sensation of watching himself carry out the shootings,

12  which these doctors indicated would have provided support for a diagnosis of dissociative

13  reaction. However, as the PCR court noted, Dr. Hammitt herself, to whom the crucial

14  statement was made on the morning after Petitioner's arrest, did not conclude that Petitioner

15  exhibited symptoms of psychosis or that his feeling of watching himself commit the crimes

16  was the product of anything more than intoxication and shock. (Dkt. 53, Ex. 9 at 25, 31.)

17  In denying relief, the PCR court explicitly addressed the rationale underlying trial counsel's

18  decision to assert the physician-patient privilege, finding that the Hammitt information could

19  have compromised the claim that Petitioner experienced a dissociative reaction and thereby

20  undermined the insanity defense. (M.E. 5/19/97 at 7.)

21      Given that the advantages of disclosing the information contained in the Hammitt

22  interview were, as explained by the PCR court, uncertain, this Court cannot conclude that

23  counsel's decision to protect the information was "objectively unreasonable" or fell outside

24  the "wide range of reasonable professional assistance." Cone, 535 U.S. at 702 (reiterating

25  that "it is all too easy to conclude that a particular act or omission of counsel was

26  unreasonable in the harsh light of hindsight").

27      Even if counsel's decision not to disclose the information was deficient, Petitioner

28

1    must also satisfy the second prong of <u>Strickland</u> and show that he was prejudiced by the lack

2    of disclosure.  To do so he must demonstrate that, but for counsel's decision not to share the

3    contents of the Hammitt interview with his experts, there was a "reasonable probability" that

4    the outcome of the trial would have been different.  <u>Strickland</u>, 466 U.S. at 694.

5         The record indicates that access to Petitioner's statements to Dr. Hammitt would have

6    buttressed Dr. Bindelglas's testimony that Petitioner was insane and that he experienced a

7    dissociative reaction during the shootings; it might also have enabled Dr. Garcia-Bunuel to

8    testify that Petitioner was insane and experienced a dissociative reaction.  Standing alone,

9    these circumstances might have strengthened Petitioner's insanity defense.  However, in

10   making the interview available, counsel would have opened the door to Dr. Hammitt's

11   observations and opinions about Petitioner's mental state near the time of the shootings,

12   which would likely have had a negative effect on the dissociative-reaction claim.  Given this

13   complicated dynamic, the Court concludes that Petitioner has not shown a reasonable

14   probability that the outcome of his trial would have been different if counsel had waived the

15   physician-patient privilege and provided the Hammitt information to Drs. Bindelglas and

16   Garcia-Bunuel.

17        The same is true with respect to Petitioner's lack-of-premeditation defense.  Petitioner

18   asserts that the Hammitt information would have bolstered this defense because it would

19   have supported a finding that, due to a dissociative reaction at the time of the shootings, he

20   lacked the ability to premeditate the deaths of his victims.  (<u>See</u> Dkt. 52 at 22-23, 25 n.8.)

21   However, as already discussed, the Hammitt interview did not provide unqualified support

22   for Petitioner's alleged dissociative reaction.  More significantly, expert testimony in this

23   regard would not have been admissible under the law in effect at the time of Petitioner's trial.

24        Arizona has long rejected the affirmative defense of diminished capacity.  <u>State v.</u>

25   <u>Mott</u>, 187 Ariz. 536, 540-41, 931 P.2d 1046, 1050-51 (1997) (citing <u>State v. Schantz</u>, 98

26   Ariz. 200, 212-13, 403 P.2d 521, 529 (1965)).  The practical effect of this rule is that a

27   defendant cannot, during trial, present evidence of mental disease or defect to show that he

28

1   was *incapable* of forming a requisite mental state for a charged offense. Mott, 187 Ariz. at

2   540, 931 P.2d at 1050; Schantz, 98 Ariz. at 213, 403 P.2d at 529; Clark v. Arizona, 126 S.

3   Ct. 2709, 2737 (2006) (upholding the constitutionality of the Mott rule and finding that the

4   exclusion of expert testimony regarding diminished capacity does not violate due process).

5       Arizona law does permit a defendant to present evidence to show that he has a

6   *character trait* for acting reflexively, rather than reflectively, for the purpose of challenging

7   a finding of premeditation – i.e., to show that he did not actually reflect after forming the

8   requisite intent. See State v. Christensen, 129 Ariz. 32, 35-36, 628 P.2d 583-84 (1981);

9   Vickers v. Ricketts, 798 F.2d 369, 371 (9th Cir. 1986).[10] However, this rule is limited in that

10  an expert cannot testify as to whether the defendant was acting impulsively *at the time of the*

11  *offense.* Id. at 35-36, 628 P.2d at 583-84.

12      Here, Petitioner argues that counsel should have provided the Hammitt information

13  to his experts, not to establish a general character trait of impulsivity, but to show that he was

14  incapable of premeditating murder due to a mental defect at the time of the crime. Because

15  such evidence would not have been admissible, Mott, 187 Ariz. at 540, 931 P.2d at 1050,

16  Petitioner's counsel cannot be faulted for failing to disclose the information, and there is no

17  reasonable probability the trial outcome would have been different if the information had

18  been made available.

19      Petitioner has not shown that the PCR court applied Strickland in an objectively

20  unreasonable manner when it rejected Petitioner's challenge to counsel's handling of the

21  Hammitt interview. Therefore, Petitioner is not entitled to relief on Claim 3.

22  **Claim 5:   Petitioner's right to effective assistance of counsel under the Sixth and**
23  **Fourteenth Amendments was violated by trial counsel's failure during the**
    **sentencing hearing to cite the opinions of the experts regarding**

24  _____

25      [10]   In Christensen, the defendant sought to admit expert testimony regarding his
    tendency to act without reflection. The Arizona Supreme Court held it was error to exclude
26  such testimony because "establishment of [this character trait] tends to establish that
    appellant acted impulsively. From such a fact, the jury could have concluded that he did not
27  premeditate the homicide." 129 Ariz. at 35, 628 P.2d at 583.

28

**Petitioner's intoxication at the time of the offenses.**

Petitioner alleges that counsel was ineffective for failing to call any of the mental health experts, including Dr. Hammitt, as a witness at the sentencing stage of the trial. (Dkt. 52 at 40.)  He also claims that counsel was ineffective for failing to argue that the reports prepared by those experts, which discussed Petitioner's intoxication-based impairment at the time of the offense, established the existence of a statutory mitigating circumstance under A.R.S. § 13-703(G)(1).[11]  (Id.)

Relevant Facts:

At the presentencing hearing, trial counsel presented testimony from several witnesses, including a pastor, Dr. Jones, who had counseled Petitioner after the murders, friends of Petitioner and his family, Petitioner's parents, and investigator Hanratty.  (R.T. 9/11/97.)  This testimony was offered to establish that Petitioner was remorseful for his crimes, that he appeared to have had a solid relationship with his wife and daughter, and that the killings were out of character.  (Id.)  Dr. Jones, Petitioner's father, and Hanratty also testified regarding Petitioner's history of substance abuse and his consumption of drugs and alcohol around the time of the murders.  (Id.)  Neither the prosecutor nor defense counsel presented testimony from the mental health experts.[12]

---

[11]    A.R.S. § 13-703(G)(1) provides that the court must consider as a mitigating circumstance whether, "The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution."

[12]    The State called only one witness, Investigator Saravo, who testified regarding the dimensions of the vehicle in which the victims were shot.  (R.T. 9/11/87 at 1804-09.) The testimony was elicited to support the prosecution's argument that the killings posed a grave risk of harm to others, pursuant to the aggravating factor set forth in A.R.S. § 13-703(F)(3).  Defense counsel argued against this factor, and the trial court found that it had not been proved.  (R.T. 9/25/87 at 1860-61.)  Saravo also testified that the video Petitioner rented after murdering his wife and daughter was called "The Best of Anything Goes" and depicted contestants participating in a "strip" game show.  Despite counsel's vigorous objections, the trial court cited Petitioner's choice to obtain and view the video as evidence of a depraved state of mind under § 13-703(F)(6).  (Id. at 1864.)

In his sentencing memoranda, trial counsel challenged the aggravating factors alleged by the State and again emphasized Petitioner's intoxication at the time of the offenses, the fact that the crimes were an aberration, and the depth of Petitioner's remorse.  (ROA-PCR 89, 90.)  The memoranda cited § 13-703(G)(1) but did not refer to the diagnoses of the mental health experts.  (Id.)

In its special verdict, the trial court indicated that it had "reviewed the entire file" and "all of the testimony presented to it," including testimony presented at Petitioner's competency hearing.  (M.E. 9/25/87 at 2.)  Specifically, with respect to mitigating factors, the court stated that "it has reviewed all the memoranda of defense counsel, the presentence report and addendum thereto, . . . and the remainder of the entire record, *all in order to glean all possible mitigating circumstances* put forth by defendant."  (Id. at 7) (emphasis added).

The court listed the 13 mitigating circumstances cited by defense counsel, and discussed each one.  (Id. at 7-13.)  Among the factors evaluated by the trial court were those associated with Petitioner's substance abuse and his impairment at the time of the murders. The trial court considered in detail counsel's argument that Petitioner was impaired to a degree that met the requirements of the (G)(1) mitigating factor:

> The next alleged mitigating circumstance focuses in on defendant's alcohol and drug use at and around the time of the murders.  Defendant alleges that by reason of this factor, his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired . . .

> Addressing the question of defendant's capacity to appreciate the wrongfulness of his conduct, only Dr. Bindelglas testified that defendant's capacity was markedly impaired.  Dr. Garcia-Bunuel testified that defendant did not even suffer from a mental disease or defect notwithstanding his reported alcohol and drug abuse.  Dr. Gerstenberger likewise testified that defendant suffered from no mental disease or defect and, "Was fully capable of understanding that his actions were wrong."  Dr. Stewart testified that defendant had an understanding that the nature of the offense was wrong although he did indicate that had defendant not been using alcohol and drugs, he would have had a clearer understanding.  However, he did basically understand what he was doing was wrong.  Dr. Stewart did not testify that any impairment to understanding from the alcohol and drugs was significant.

> Also noteworthy here are defendant's actions following the murders. He went to great lengths to find an appropriate place to dispose of the bodies

and after doing so, took steps to cover up his crimes. He hid the blanket and seat cover on which the victims had bled and hid the gun he had used. He then falsely reported to the police that his wife and daughter were missing in an obvious attempt to keep suspicion from focusing on him. In total, these actions point to a man who knew and fully understood that what he had done was wrong at the time he was doing it.

The second aspect of this circumstance whether defendant had the capacity to conform his conduct to the requirements of the law is not supported by substantial evidence . . . The psychiatric testimony supports the conclusion that defendant did not suffer from any mental disease or defect whether associated with alcohol and drugs or not that could be said to cause defendant to act as he did. Rather, the conclusion is appropriate that defendant was in control of his mental faculties sufficient to have refrained from killing his wife and daughter. He simply chose not to so refrain.

That defendant was not significantly impaired is also supported by the evidence of what he actually consumed. In the presentence report, Reverend Jones relates defendant had told him that over a six hour period defendant consumed only four to six wine coolers and eight to ten lines of cocaine. This is simply not enough of either substance, combined or separate, to impair a person over a six hour period sufficiently to meet the requirements of Subsection (G)(1).

The Court concludes, then, that defendant has not established as a mitigating circumstance that his capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired.

(Id. at 11-12.) The trial court also rejected the argument that Petitioner's "alleged chronic alcohol and drug use constitutes a mitigating factor as to either murder." (Id. at 11.)

On direct appeal, the Arizona Supreme Court found that the trial court did not err in its assessment of the mitigation factors, including its finding that Petitioner had failed to establish by a preponderance of the evidence that his use of alcohol and drugs significantly impaired his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law. Stanley, 167 Ariz. at 531, 809 P.2d at 956. In upholding Petitioner's sentence, the Arizona Supreme Court explained that,

We have reviewed all the testimony of the three psychiatrists and the psychologist who examined Stanley. Only one expert testified that Stanley's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was impaired. The other three testified that Stanley knew his conduct was wrong and knew so at the time he committed the crimes. His actions of disposing of the bodies, hiding the bloody blanket and seat cover, hiding the gun, and then calling in a false missing persons report were all purposeful actions and further evidence that

1         he appreciated the wrongfulness of his conduct. Two of the experts testified
2         that Stanley was not suffering from any mental illness that could have
        prevented him from conforming his conduct to the requirements of the law.

3 <u>Id.</u>

4       Petitioner raised the issues set forth in this Claim in his petition for post-conviction

5 relief. (ROA-PCR 108 at 25-29.) Citing <u>Strickland</u>'s two-pronged standard, the PCR court

6 denied the claim, finding, with respect to Petitioner's drug and alcohol abuse and "the

7 impairment of defendant's capacity to appreciate or conform his conduct to the requirement

8 of law," that Petitioner "failed to specify what further investigations counsel was reasonably

9 required to undertake or how further investigation would have altered the results of the trial

10 court." (M.E. 5/19/97 at 8.)

11      <u>Analysis:</u>

12       The right to effective assistance of counsel applies not just to the guilt phase, but

13 "with equal force at the penalty phase of a bifurcated capital trial." <u>Silva v. Woodford</u>, 279

14 F.3d 825, 836 (9th Cir. 2002) (quoting <u>Clabourne v. Lewis</u>, 64 F.3d 1373, 1378 (9th Cir.

15 1995)). Trial counsel has "a duty to make reasonable investigations or to make a reasonable

16 decision that makes particular investigations unnecessary," and "a particular decision not to

17 investigate must be directly assessed for reasonableness in all the circumstances, applying

18 a heavy measure of deference to counsel's judgments." <u>Hayes v. Woodford</u>, 301 F.3d 1054,

19 1066 (9th Cir. 2002) (quoting <u>Strickland</u>, 466 U.S. at 691). As the <u>Strickland</u> Court

20 explained, "When a defendant challenges a death sentence . . . the question is whether there

21 is a reasonable probability that, absent the errors, the sentencer . . . would have concluded

22 that the balance of aggravating and mitigating circumstances did not warrant death." 466

23 U.S. at 695. In <u>Wiggins v. Smith</u>, 539 U.S. 510, 534 (2003), the Court further noted that, "In

24 assessing prejudice, we reweigh the evidence in aggravation against the totality of available

25 mitigating evidence." The "totality of the available evidence" includes "both that adduced

26 at trial, and the evidence adduced in the habeas proceeding." <u>Wiggins,</u> 539 U.S. at 536

27 (quoting <u>Williams</u>, 529 U.S. at 397-98).

28

1      Petitioner claims that trial counsel performed ineffectively under <u>Strickland</u> by failing

2  to call the mental health experts to the stand at the presentencing hearing and by failing to

3  argue that Petitioner's intoxication at the time of the offense, as described by the experts,

4  constituted a mitigating factor pursuant to 13-703(G)(1).[13]  Petitioner contends that the PCR

5  court's denial of his sentencing-stage IAC claim involved an unreasonable application of

6  clearly established federal law.  (Dkt. 52 at 45.)

7      Respondents contend that counsel's performance was not ineffective because the

8  reports and testimony of the mental health experts were already a part of the record and there

9  was no necessity to reintroduce that information or call the experts to repeat their testimony

10 at the presentencing hearing.  Moreover, according to Respondents, Petitioner was not

11 prejudiced by counsel's strategy because the trial court had before it, and considered, the

12 entire record, including the reports and trial testimony of the mental health experts.  This

13 Court agrees.

14     The cases cited by Petitioner do not support a contrary conclusion.  Petitioner asserts

15 that, had counsel properly emphasized the opinions of the mental health experts at

16 sentencing, the trial court would have been compelled, under <u>State v. Rossi</u>, 154 Ariz. 245,

17 741 P.2d 1223 (1987), to find that the (G)(1) mitigating factor had been proved.  However,

18 both the trial court and the Arizona Supreme Court considered the holding in <u>Rossi</u> and found

19

20 _____

21     [13]     Petitioner also claims that trial counsel's performance was deficient for failing
   to argue that Petitioner's impairment at the time of the killings constituted a nonstatutory, as
22 well as a statutory, mitigating factor.  (Dkt. 52 at 38.)  Petitioner raises this aspect of his
   sentencing-phase IAC claim for the first time in his merits brief.  Because he did not raise
23 it in his second amended petition (<u>see</u> dkts. 33 at 20, 43 at 10), the claim is barred.  <u>See</u>
   <u>Mayle v. Felix</u>, 125 S. Ct. 2562, 2573 (2005) (citing Rule 2(c) of the Rules Governing
24 Habeas Cases, which instructs Petitioner to "specify all grounds of relief available" and to
   "state the facts supporting each ground").
25
       In addition, Petitioner again cites as evidence of deficient performance counsel's
26 failure to disclose the Hammitt interview to his mental health experts.  However, as already
   discussed with respect to Claims 2 and 3, the value of the Hammitt information was
27 negligible.

28

1    it factually distinguishable.  See Stanley, 167 Ariz. at 530-31, 809 P.2d at 955-56.

2        In Rossi, the Arizona Supreme Court held that the defendant, charged with burglary

3    and murder, proved by a preponderance of the evidence that his cocaine addiction was so

4    overwhelming that it significantly impaired his capacity to conform his conduct to the

5    requirements of the law.  154 Ariz. at 251, 741 P.2d at 1229.  Rossi presented unrefuted

6    expert testimony that cocaine "controlled" and "dominated" his life, that he "would not have

7    committed the crime if he had not been an addict," and that an addict "will do anything he

8    can to get the drug."  Id. at 250, 741 P.2d at 1228.  By contrast, as the trial court (M.E.

9    9/25/87 at 12) and the Arizona Supreme Court observed, Petitioner did not present

10   undisputed evidence that either his chronic substance abuse or his state of intoxication at the

11   time of the murders "overwhelmed his ability to control his physical behavior." 167 Ariz. at

12   531, 809 P.2d at 956.  Rather, the experts reached different conclusions as to the effect

13   Petitioner's reported consumption of drugs and alcohol had on his ability to appreciate or

14   control his conduct, with two of the experts (Drs. Bindelglas and Garcia-Bunuel) finding

15   serious impairment, and two (Drs. Stewart and Gerstenberger) finding that some degree of

16   impairment was possible.[14]

17       Petitioner also cites Smith v. Stewart, 189 F.3d 1004 (9th Cir. 1999), and Clabourne

18   v. Lewis, 64 F.3d 1373 (9th Cir. 1995), to support his position that counsel's performance

19   at sentencing was deficient and prejudicial.  In Smith and Clabourne, the Ninth Circuit held

---

21       [14]    Dr. Bindelglas characterized Petitioner as "significantly impaired" at the time
22   of the crimes.  (ROA-PCR 44 at 4.)  Dr. Garcia-Bunuel's report described Petitioner's
     condition as "very seriously impaired" and opined that, had Petitioner not been under the
23   influence of drugs and alcohol, the crimes would not have occurred.  (ROA-PCR 48 at 6.)
     In contrast, Dr. Stewart explained that Petitioner's drug and alcohol use "could have greatly
24   impaired" and "may have impaired" his judgment, reasoning ability, and ability to control
     his behavior, but also noted that Petitioner was able to recall the details of the incident and
25   to act in a rational manner immediately after the crimes.  (ROA-PCR 43 at 2, 8.)  Dr.
     Gerstenberger found that Petitioner's state of intoxication "may have impaired his ability to
26   function" but like Dr. Stewart noted that Petitioner's behavior after the crimes indicated that
27   he was "capable of telling right from wrong."  (ROA-PCR 45 at 5.)

28

that trial counsel's failure to develop and present a case in mitigation constituted ineffective assistance under <u>Strickland</u>. The Court finds that these cases, both involving habeas petitions filed before the AEDPA was enacted, are inapposite.[15]

The clearly-established federal law governing this claim is that set forth in <u>Strickland</u> and its progeny, including <u>Bell v. Cone</u>, 535 U.S. at 685. In <u>Cone</u>, a jury convicted the defendant of murdering an elderly couple and sentenced him to death after a hearing in which defense counsel presented no witnesses and made no closing argument. <u>Id.</u> at 691. Instead, counsel cross-examined the prosecution's witnesses and directed the jury's attention to mitigation evidence that had already been presented in the guilt phase of the trial, including the defendant's drug addiction, mental problems, and remorse. <u>Id.</u> After noting the deferential standards set forth in the AEDPA and required by its own precedent, the Supreme Court explained that for Cone's claim to succeed,

> he must do more than show that he would have satisfied <u>Strickland</u>'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied <u>Strickland</u> incorrectly. Rather, he must show that [the state court] applied <u>Strickland</u> to the facts of his case in an objectively unreasonable manner.

<u>Id.</u> at 698-99 (citation omitted). The Court found that Cone could not make such a showing. <u>Id.</u> at 699. The holding in <u>Cone</u> compels this Court to reach the same result with respect to Petitioner's claim.

Like Petitioner's trial counsel, Cone's attorney "was faced with the formidable task of defending a client who had committed a horribly brutal and senseless crime." <u>Id.</u> Like

---

[15]    In <u>Clabourne</u>, 64 F.3d at 1385, the court found that counsel was ineffective where he presented no testimony or evidence at sentencing, after having called only one witness at the guilt phase of trial, a psychiatrist who was not prepared to testify about the defendant's mental state at the time of crimes; based on these circumstances, the case was not one "where the [mitigation] evidence had already been presented at trial." In <u>Smith</u>, 189 F.3d at 1009, counsel had an opportunity to present nonstatutory mitigation information at a resentencing hearing, but instead presented no evidence and relied solely on the expert testimony he had presented at the first sentencing and which the trial court had already rejected as statutory mitigation.

Petitioner's counsel, Cone's attorney presented an insanity defense at the guilt stage of the trial, so that "he was able to put before the jury extensive testimony about what he believed to be the most compelling mitigation evidence in the case," including evidence about his client's history of drug addiction and its effects on him at the time of the crimes. Id. Like Petitioner's counsel, at sentencing Cone's attorney offered an argument based on insufficient capacity. Id. at 699-700. Finally, like Petitioner, Cone claimed that counsel was ineffective "for not recalling his medical experts during the sentencing hearing." Id. at 699. The Supreme Court found tactical support for counsel's decisions, explaining that "counsel reasonably could have concluded that the substance of [the experts'] testimony was still fresh to the jury." Id.

While Cone's lawyer chose not call Cone's mother or any of Cone's friends to testify on his behalf, id. at 700, Petitioner's counsel presented testimony from Petitioner's parents, from acquaintances, and from a pastor. Through these witnesses, Petitioner placed before the trial court information in support of a number of mitigating circumstances, including the positive aspects of Petitioner's character and background and his feelings of remorse, factors which the trial court ultimately agreed were mitigating. (See R.T. 9/25/87 at 1879.)

The witnesses counsel called at the presentencing hearing also confirmed or supplemented the factual information contained in the testimony and reports of the mental health experts regarding Petitioner's history of substance abuse and his state of intoxication at the time of the murders.

It is clear from the trial court's ruling that in considering factor (G)(1) the court took into account Petitioner's reported chronic substance abuse and level of impairment at the time of the murders. (M.E. 9/25/87 at 11-12.) The court based its ruling rejecting (G)(1) as a mitigating factor on the whole of the record, including the testimony and reports of all of the mental health experts. (Id.) The testimony and reports of each of the experts in turn addressed Petitioner's state of mind at time of the murders, and in doing so they specifically considered the effect of Petitioner's reported ingestion of drugs and alcohol. See supra note

1  14.

2      Therefore, as the jury did in <u>Cone</u>, the trial court had before it the information it

3  needed to assess Petitioner's claim that, while not legally insane, he was impaired at the time

4  of the crimes to a degree warranting consideration as a mitigating factor.  Because he had

5  already presented such information to the trial court, counsel was not derelict in failing to

6  present it again, or in another form, to the same judge at sentencing.  Moreover, even if

7  counsel's performance at the sentencing phase were to be characterized as deficient, the fact

8  that the sentencer already possessed the information, and, as the trial judge, was in a position

9  to evaluate such information and apply it to the requirements of factor (G)(1), indicates that

10  Petitioner was not prejudiced by counsel's failure to re-offer the same information at

11  sentencing.

12      The PCR court was presented with the information and arguments Petitioner contends

13  were erroneously withheld from the trial court at sentencing.  The court then applied the

14  <u>Strickland</u> standard in assessing trial counsel's performance, and denied Petitioner's

15  sentencing-phase IAC claim on the grounds that he failed to show that there were additional

16  steps trial counsel should have taken that could have affected Petitioner's sentence.  (M.E.

17  5/19/97 at 8.)  The PCR court's decision rejecting Petitioner's claim of ineffective assistance

18  of counsel at the sentencing stage did not involve an unreasonable application of clearly

19  established federal law.  Therefore, Petitioner is not entitled to relief on Claim 5.

20  **Claim 6**:      **The state courts failed to consider and weigh relevant mitigation evidence
21                 and therefore Petitioner was sentenced to death in violation of the Eighth
                 and Fourteenth Amendments.**

22      Petitioner alleges that both the trial court and the Arizona Supreme Court failed to

23  consider and weigh relevant mitigation evidence. (Dkt. 52 at 46-50.) Specifically, he claims

24  that both courts failed to give proper consideration and weight to the opinions of Drs.

25  Bindelglas, Garcia-Bunuel, and Gerstenberger, which, according to Petitioner, tended to

26  show the existence of the insufficient capacity aggravating factor under A.R.S. § 13-

27  703(G)(1).  (<u>Id.</u> at 46, 49.)  He also claims that the state courts failed to consider evidence

28

1  of Petitioner's impairment as a nonstatutory mitigating circumstance. (<u>Id.</u> at 49-50.) The
2  Court disagrees.

3  Under the federal constitution, in capital sentencing proceedings the sentencer,
4  whether by statute or case law or any other legal barrier, must not be precluded from
5  considering relevant mitigation evidence. <u>See</u> <u>Lockett</u>, 438 U.S. 586 (1978). In <u>Lockett</u>, and
6  subsequently in <u>Eddings v. Oklahoma</u>, 455 U.S. 104 (1982), the Supreme Court held that
7  under the Eighth and Fourteenth Amendments the sentencer must be allowed to consider, and
8  may not refuse to consider, any constitutionally relevant mitigating evidence. <u>Eddings</u>, 455
9  U.S. at 113-14. Constitutionally relevant mitigating evidence consists of "any aspect of a
10 defendant's character or record and any of the circumstances of the offense that the defendant
11 proffers as a basis for a sentence less than death." <u>Lockett</u>, 438 U.S. at 604. However, while
12 the sentencer must not be foreclosed from considering relevant mitigation information, "it
13 is free to assess how much weight to assign to such evidence." <u>Ortiz v. Stewart</u>, 149 F.3d
14 923, 943 (9th Cir. 1998); <u>see</u> <u>Eddings</u>, 455 at 114-15 ("The sentencer . . . may determine the
15 weight to be given relevant mitigating evidence").

16 On habeas review, the federal court does not evaluate the substance of each piece of
17 evidence submitted as mitigation; rather, it reviews the state court record to ensure that the
18 state court allowed and considered all relevant mitigation. <u>See</u> <u>Jeffers v. Lewis</u>, 38 F.3d 411,
19 418 (9th Cir. 1994) (en banc) (holding that when it is evident that all mitigating evidence was
20 considered, the trial court is not required to discuss each piece of such evidence). As the
21 Ninth Circuit has noted, "the trial court need not exhaustively analyze each mitigating factor
22 'as long as a reviewing federal court can discern from the record that the state court did
23 indeed consider all mitigating evidence offered by the defendant.'" <u>Moormann v. Schriro</u>,
24 426 F.3d 1044, 1055 (9th Cir. 2005) (quoting <u>Clark v. Ricketts</u>, 958 F.2d 851, 858 (9th Cir.
25 1991)); <u>see</u> <u>Parker v. Dugger</u>, 498 U.S. 308, 314-15, 318 (1991) (holding that the sentencing
26 court properly considered all information, including nonstatutory mitigation, where the court
27 stated that it considered all the evidence and found no mitigating circumstances that

28

outweighed the aggravating circumstances); <u>LaGrand v. Stewart</u>, 133 F.3d 1253, 1263 (9th Cir. 1998); <u>Gerlaugh v. Stewart</u>, 129 F.3d 1027, 1044 (9th Cir. 1997).  Finally, "if there is a finding that the sentencing court gave due consideration to all mitigating evidence, . . . it is unnecessary for the court specifically to discuss the cumulative weight of the evidence." <u>Ortiz</u>, 149 F.3d at 943.

In Arizona, sentencing courts have been instructed that if relevant mitigating information does not rise to the level of a statutory mitigating circumstance, it must nonetheless be considered as non-statutory mitigation in order to determine whether the defendant should be treated with leniency.[16] <u>See</u> <u>State v. McMurtrey</u>, 136 Ariz. 93, 102, 664 P.2d 637, 646 (1983) ("<u>McMurtrey I</u>").

As discussed with respect to Claim 5, the record clearly indicates that both the trial court, in its sentencing order, and the Arizona Supreme Court, in its independent review of the aggravating and mitigating factors, specifically considered the reports of the mental health experts in their assessment of the aggravating factor set forth in § 13-703(G)(1).  <u>See</u> <u>Stanley</u>, 167 Ariz. at 529-31, 809 P.2d at 954-56.

Petitioner also contends, however, that "[t]here is absolutely no indication in the record that the trial court and the Arizona Supreme Court considered and weighed Petitioner's drug and alcohol intoxication at the time of the offense as non-statutory mitigation." (Dkt. 52 at 49.)  The record belies this contention.

In its special verdict, the trial court noted that defense counsel put forward 13

---

[16]     As set forth in A.R.S. § 13-703(G),

The trier of fact shall consider as mitigating circumstances any factors proffered by the defendant or the state that are relevant in determining whether to impose a sentence less than death, including any aspect of the defendant's character, propensities or record and any of the circumstances of the offense, including but not limited to the following [enumerated factors].

categories of mitigating information; only three of these categories – insufficient capacity due to alcohol and drug consumption under (G)(1); unusual and substantial duress, also caused by drug and alcohol abuse, pursuant to factor (G)(2); and age (G)(5) – described statutory mitigating factors.  (M.E. 9/25/87 at 7-8.)  The remaining 10 circumstances constituted nonstatutory mitigation, and among them were counsel's arguments that Petitioner's chronic substance abuse and his attempt to seek professional help for his drug and alcohol problems constituted mitigating circumstances.  (Id.)  The trial court explicitly addressed all of counsel's arguments for mitigation, including his assertion that aspects of Petitioner's history of substance abuse constituted a nonstatutory mitigating circumstance.  The court found that Petitioner's attempt to rehabilitate himself was a mitigating circumstance.  (Id. at 9.)  In addressing chronic substance abuse as a nonstatutory mitigating factor, the court found that,

> In this case, the clear weight of the evidence indicates that defendant's chronic drug and alcohol use had not impaired his mental capabilities in the sense that he was suffering, for example, from organic brain damage.  Moreover, defendant did maintain a full-time job throughout the course of his drug and alcohol use and subsequent to the murders he followed through on a detailed course of attempting to cover up evidence of these murders.  The Court does not find that defendant's alleged chronic alcohol and drug use constitutes a mitigating factor to either murder.

(Id. at 11.)  The court then proceeded to address the "next alleged mitigating circumstance, defendant's alcohol and drug use at and around the time of the murders" – i.e., statutory factor (G)(1).  (Id.)

Based upon this record, contrary to Petitioner's argument, the trial court clearly considered Petitioner's background of drug and alcohol abuse as a nonstatutory mitigating factor.  It is also clear that in considering the effects of Petitioner's chronic substance abuse, the trial court did effectively take into account evidence of Petitioner's impairment at the time of the offense that did not satisfy the (G)(1) statutory factor.

The sentencer considered all of the mitigation evidence presented by Petitioner, thereby fulfilling the directive set forth in Lockett and Eddings.  In addition, the Arizona

1   Supreme Court performed an independent review of Petitioner's sentence. Stanley, 167 Ariz.

2   at 528, 809 P.2d at 953 ("In a capital sentencing case, we must independently review the

3   existence of aggravating or mitigating circumstances and determine the propriety of the

4   imposed death penalty").  In upholding Petitioner's sentence, the Arizona Supreme Court

5   summarized the trial court's analysis of the proffered mitigation evidence. Id. at 529-31, 809

6   P.2d at 954-56.  The fact that the court did not repeat the details of the trial court's special

7   verdict or apply the analytical framework now advanced by Petitioner is of no significance

8   to this Court's conclusion that the state courts did not violate Petitioner's rights under

9   Lockett and Eddings.

10          In carrying out its habeas review, this Court presumes that "state courts follow the

11   law, even when they fail to so indicate."  Jeffers, 38 F.3d at 415; see Visciotti, 537 U.S. at

12   24.  At the time of Petitioner's conviction, it was "well settled that a judge should consider

13   any evidence of mental impairment to mitigate capital punishment."  State v. Fierro, 166

14   Ariz. 539, 553, 804 P.2d 72, 86 (1990) (citing Lockett and McMurtrey I, 136 Ariz. at 102,

15   664 P.2d at 638); see State v. Lopez, 175 Ariz. 407, 414-16, 857 P.2d 1268-70 (1993).

16   Therefore, when the Arizona Supreme Court upheld Petitioner's death sentence on direct

17   appeal, it was clear that for mitigation purposes evidence of impairment due to substance

18   abuse included information, as cited by the trial court, which fell outside the criteria set forth

19   in § 13-703(G)(1) but "which in some other way suggests that the defendant should be

20   treated with leniency."  McMurtrey I, 136 Ariz. at 101, 664 P.2d at 646.

21          Unlike Smith v. McCormick, 914 F.3d 1153 (9th Cir. 1990), cited by Petitioner, this

22   is not a case where the state courts refused to consider the nonstatutory mitigation

23   information presented by the defendant.  The state courts in Smith violated Lockett and

24   Eddings by explicitly excluding from their sentencing decisions any evidence of Smith's

25   character and potential for rehabilitation. Id. at 1165.  The Ninth Circuit held that Smith was

26   entitled to habeas relief, explaining that while "[t]he Montana courts were entitled to

27   conclude that the mitigation evidence Smith submitted under the catchall subsection . . . was

28

1  not persuasive enough to grant a sentence less than death[,] they were not entitled to refuse

2  to consider it as mitigating evidence simply because it fell below a certain weight." Id.  In

3  contrast to the Montana state courts, here the trial court and the Arizona Supreme Court

4  considered all of the mitigation evidence submitted by Petitioner's trial counsel.

5      The trial court and the Arizona Supreme Court took into account the entirety of the

6  record, which included information about Petitioner's background of substance abuse.

7  Having considered such mitigation evidence as both statutory and nonstatutory mitigation,

8  the trial court fulfilled its constitutional duty under Lockett and Eddings.  The fact that the

9  court found the evidence "inadequate to justify leniency . . . did not violate the constitution."

10  Ortiz, 149 F.3d at 943.

11      The decision of the Arizona Supreme Court upholding Petitioner's death sentence was

12  neither contrary to nor an unreasonable application of clearly established federal law.

13  Therefore, Petitioner is not entitled to relief on Claim 6.

14                          **EVIDENTIARY DEVELOPMENT**

15      Petitioner has not requested evidentiary development.  Furthermore, the Court

16  concludes, after reviewing the record, that none of Petitioner's claims warrants evidentiary

17  development because the allegations, even if true, do not entitle Petitioner to habeas relief.

18                                  **CONCLUSION**

19      The Court finds that Petitioner has failed to establish entitlement to habeas relief on

20  any of his claims.  The Court further finds that an evidentiary hearing in this matter is neither

21  warranted nor required.

22      Accordingly,

23      **IT IS HEREBY ORDERED** that Petitioner's Amended Petition for Writ of Habeas

24  Corpus (Dkt. 33) is **DENIED WITH PREJUDICE.**  The Clerk of Court shall enter

25  judgment accordingly.

26      **IT IS FURTHER ORDERED** that the stay of execution entered by this Court on

27  March 11, 1998, is **VACATED.**

28
                                    - 49 -

1    **IT IS FURTHER ORDERED** that the Clerk of Court send a courtesy copy of this

2    Order to Noel Dessaint, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix,

3    Arizona 85007-3329.

4    DATED this 27th day of September, 2006.

5

6

7

8

9

10    _____
      Mary H. Murguia
      United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28